FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 14, 2025

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TIMOTHY H.,[1]<br><br>                Plaintiff,<br><br>     v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>             Defendant. | No.  2:25-cv-00009-EFS<br><br>**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR MORE PROCEEDINGS** |

Plaintiff Christopher R. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 16 benefits, while the Commissioner asks the Court to affirm the ALJ's denial. As is explained below, because the ALJ failed to consider the longitudinal record regarding Plaintiff's varicose veins and lower extremity

_____

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." See LCivR 5.2(c).

DISPOSITIVE ORDER - 1

neuropathy when considering the medical opinion and Plaintiff's subjective complaints and erred in failing to call a medical expert, this matter is remanded for further proceedings.

## I.    Background

In March 2019, Plaintiff applied for benefits under Title 16, claiming disability based on chronic post-traumatic stress disorder (PTSD), personality disorder, mood disorder, an abdominal hernia, and bilateral carpal tunnel syndrome.[2] Plaintiff amended his claim later in March 2019 to include bilateral venous insufficiency/varicose veins and dyslexia as severe impairments.[3]

When he filed his application, Plaintiff was 50 years old, which made him a person closely approaching advanced age, and in September 2023 he changed category to that of a person of advanced age.[4] Plaintiff attended school to the 10th grade, including attending special education classes from 1980–82, and completed a GED in

_____

[2] AR 307-313, 406.

[3] AR 404.

[4] 20 CFR § 416.963.

1986.[5]. The vocational expert testified that Plaintiff's past relevant work was as a plastic molder, which is light and semi-skilled with an SVP of 3; and as a binding machine operator, which is medium and unskilled with an SVP of 2.[6]

Plaintiff's claim was denied at the initial and reconsideration levels.[7] In November 2019, Plaintiff requested an administrative hearing.[8] In May 2023, ALJ Allen Erickson held a video hearing, at which Plaintiff appeared unrepresented, and ALJ Erickson postponed the hearing in order to allow Plaintiff to hire an attorney.[9] In September 2023, the ALJ held a second hearing at which Plaintiff

---

[5] AR 400.

[6] AR 51-53.

[7] AR 128, 135.

[8] AR 138.

[9] AR 87-100.

appeared by video and his counsel and a vocational expert appeared by telephone.[10]  Plaintiff and the vocational expert testified.[11]

Plaintiff testified that in March 2019 he had just completed his carpal tunnel surgery and been told that he reached maximum improvement.[12] Plaintiff's doctor said he had serious permanent damage.[13] He said he understood he could not be paid benefits after his confinement in August 2022.[14] He said that his hands would lock up and he would feel like there was an icepick through his wrist, and he would have to un-pry his fingers.[15] It was sporadic but he would need to stop using his hands after 20-30 minutes and let them relax.[16] He

_____

[10] AR 38-86.

[11] *Id.*

[12] AR 54.

[13] AR 55.

[14] AR 56.

[15] AR 58.

[16] AR 58-59.

said the left (nondominant) was worse than the right.[17] After the surgery, his pain level was a 5-6.[18]

Plaintiff said he also had issues with his legs and varicose veins and that after walking 15 minutes his legs felt like they were on fire.[19] He said the pain was an 8-9 and he would need to sit.[20] He said they were trying to figure where the nerve damage originated.[21] Between the first surgery in 2019 and the last one in 2021, Plaintiff said that there are 46-47 varicose veins removed from his legs and that he had both stripping and ablation procedures to remove his varicose veins.[22] Plaintiff said he had stents put in his arteries going from his knees up

---

[17] AR 59.

[18] *Id.*

[19] AR 59-60.

[20] AR 60.

[21] *Id.*

[22] *Id.*

DISPOSITIVE ORDER - 5

to his groin area to allow blood flow and this caused chronic issues with walking.[23]

Plaintiff said he had PTSD from childhood abuse and that since 2019 he has avoided others.[24] He said he had worked at jobs that did not require him to work with others, and that for 10 years as a machinist he was able to work solo.[25] He had a lot of treatment for his physical impairments with ablation and vein stripping but that when he went for psychiatric treatment he found the side effects of the medication they gave him made things worse.[26] He got back together with his ex-wife in late 2019 but she passed away in July 2020.[27] From 2020 to 2022, he had friends but did not hang out with them and was usually alone.[28] He lived in a little office space in his parents' home

_____

[23] AR 60-61.

[24] AR 61.

[25] AR 62.

[26] AR 62-63.

[27] AR 63.

[28] AR 64.

from mid-2019 to mid-2020 and then was homeless.[29] He lived in his car from mid-2020 until the time he was incarcerated.[30] When he was in his car he didn't do much.[31] He once drove to TriCities but made no other trips.[32] He would eat precooked meals that he defrosted in his car.[33]

Plaintiff testified that he needed to lie down due to the pressure and swelling in his legs and had to elevate his legs above waist level for 15 minutes about 3-4 times a day.[34] He said that even basic standing and walking caused pressure and swelling and that the longer he was on the feet the longer he would need to elevate them.[35] If he stood too

---

[29] AR 65.

[30] AR 66-67.

[31] AR 69.

[32] AR 69-70.

[33] AR 70-71.

[34] AR 71-72.

[35] AR 72.

long, his legs felt like they were burning and the pain was worse than the swelling.[36]

He said that he also needed to stretch his hands for about 15 minutes every half hour and that after working continuously on a car with his hands for 2 hours he will need to stretch them every 10 minutes.[37] He is right-handed and can write for 45 minutes before having to stop for 15-20 minutes before he can write again.[38] He also said he has problems with people being physically near him and will at times want to have his back against a wall so no one is behind him.[39] He sleeps only 3-4 hours a night because of nightmares.[40] About 3 times a month he has days with flashbacks and needs to stay in bed.[41]

---

[36] *Id.*

[37] AR 73.

[38] AR 73-74.

[39] AR 74-75.

[40] AR 76.

[41] *Id.*

At least 6-7 days a month his pain in his legs was so bad that he didn't leave his car to get food.[42]

After the hearing, the ALJ denied benefits.[43] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with the medical evidence and other evidence in the record."[44] As to the medical opinions and prior administrative medical findings, the ALJ found:

- the administrative medical findings of JD Fitterer, MD, to be not persuasive;

- the examining medial findings of Curtis GG Greenfield, PsyD, to be somewhat persuasive;

- the administrative medical findings of Jan Lewis, PhD; Matthew Comrie, PsyD; and Gordon Hale, MD, to be somewhat persuasive.[45]

_____

[42] AR 77.

[43] AR 16-37. Per 20 C.F.R. § 404.1520(a)-(g), a five-step evaluation determines whether a claimant is disabled.

[44] AR 25-29.

[45] AR 29-30.

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff engaged in substantial gainful activity since March 18, 2019, the application date.

- Step two: Plaintiff had the following medically determinable severe impairments: bilateral lower extremity varicose veins, PTSD, and major depressive disorder. The ALJ also found the following impairments to be medically determinable non-severe impairments: bilateral carpal tunnel syndrome with status post surgeries, peripheral neuropathy, right hand laceration, hypertension, GERD, hyperlipidemia, insomnia, and ventral hernia. He also found Plaintiff's personality disorder to be medically non-determinable.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments and specifically considered Listings 4.11, 12.04, and 12.15.

- RFC: Plaintiff had the RFC to perform a full range of work at the medium exertional level, with the following exceptions:

> he could occasionally climb ladders, ropes, or scaffolds. He could understand, remember, and apply detailed

> not complex instructions, not in fast-paced production type environment, with exposure to only occasional workplace changes and only occasional interaction with the general public.

- Step four: Plaintiff is able to perform past relevant work as a plastic molder and a bonding machine operator.[46]

Thus, he found Plaintiff was not disabled pursuant to the Act.[47]

On November 5, 2024, the Appeals Council denied Plaintiff's appeal.[48] Plaintiff timely requested review by this Court.[49]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[50] Substantial evidence is

---

[46] AR 21–30.

[47] AR 30-31.

[48] AR 1-6.

[49] ECF No. 1.

[50] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012),

1  "more than a mere scintilla but less than a preponderance; it is such

2  relevant evidence as a reasonable mind might accept as adequate to

3  support a conclusion."[51]

### III.  Analysis

5  Plaintiff argues the ALJ erred when assessing the medical

6  opinions, erred in his step-two evaluation by rejecting carpal tunnel

7  _____

8  *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that

9  the court may not reverse an ALJ decision due to a harmless error—

10  one that "is inconsequential to the ultimate nondisability

11  determination").

12  [51] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978,

13  980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028,

14  1035 (9th Cir. 2007) (The court "must consider the entire record as a

15  whole, weighing both the evidence that supports and the evidence that

16  detracts from the Commissioner's conclusion," not simply the evidence

17  cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d

18  383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does

19  not indicate that such evidence was not considered[.]").

syndrome and neuropathy as severe impairments, erred by rejecting Plaintiff's symptom reports, and erred in his step-four and step-five evaluations.[52] In response, the Commissioner argues that there was no error in the ALJ's evaluation of the medical opinions, that there is no error in the ALJ's evaluation at steps two, four, or five, and that the ALJ's rejection of Plaintiff's symptom reports is supported by substantial evidence.[53] As is explained below, the ALJ failed to consider the consistency of Dr. Hale's opinions with the longitudinal record indicating that for at least a substantial portion of the relevant period Plaintiff suffered chronic venous insufficiency, and therefore the ALJ's evaluation of the opinion is not supported by substantial evidence.

## A.    Medical Opinions: Plaintiff establishes consequential error.

Plaintiff argues the ALJ erred when he ignored the opinion that Plaintiff needed to elevate his legs and avoid prolonged sitting and

---

[52] ECF No. 8.

[53] ECF No. 13.

standing, by PA-C Leslie Pohl, ARNP Lindsay Waterman, PA-C Chrys Buchanan, and Dr. Nicholas Garcia, and instead found Dr. Gordon Hale's opinion that Plaintiff could sit, stand, and walk for six hours a day to be "somewhat persuasive." The Commissioner argues that the statements made by PA-C Pohl, ARNP Waterman, PA-C Buchanan, and Dr. Garcia did not constitute a "medical opinion." The Court finds that, regardless of whether the statements met the definition of a "medical opinion," they should have been considered both generally and specifically when evaluating the overall consistency of Dr. Hale's opinion with the longitudinal record, and these errors are consequential.

1.    <u>Standard</u>

The regulations define a "medical opinion" as follows:

A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: (For claims filed (see § 404.614) before March 27, 2017, see § 404.1527(a) for the definition of medical opinion.)

(i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

1

2

3

4

> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

5

6

> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

7

> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.[54]

8      The ALJ must consider and articulate how persuasive he found

9   each medical opinion and prior administrative medical finding.[55] The

10   factors for evaluating the persuasiveness include, but are not limited

11   to, supportability, consistency, relationship with the claimant, and

12   specialization.[56] Supportability and consistency are the most important

13   factors, as the regulations require the ALJ to *consider and explain* the

14

15

_____

16   [54] 20 C.F.R. § 416.913(2).

17   [55] 20 C.F.R. § 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th

18   Cir. 2022).

19   [56] 20 C.F.R. § 416.920c(1)–(5).

supportability and consistency of each medical opinion and prior

administrative medical finding:

> The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.[57]

> The regulations define these two required factors as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[58]

---

[57] *Id.* § 404.1520c(b)(2).

[58] *Id.* § 404.1520c(c)(1)–(2).

DISPOSITIVE ORDER - 16

1    The ALJ may, but is not required to, explain how the other listed

2    factors were considered.[59] When considering the ALJ's findings, the

3    Court is constrained to the reasons and supporting explanation offered

4    by the ALJ.[60]

5        2.    Relevant Medical Records

6        On April 23, 2019, Plaintiff presented to Nicholas Garcia, MD, of

7    Multicare Vascular Surgery for follow-up for bilateral varicose veins.[61]

8    Plaintiff reported that he had a 20-year history of varicose veins and

9    began having discomfort in his legs 15 years ago and was scheduled to

10   have a surgery in 2011 but it was cancelled when he was

_____

12   [59] *Id.* § 404.1520c(b)(2). When two or more medical opinions or prior

13   administrative findings "about the same issue are both equally well-

14   supported . . . and consistent with the record . . . but are not exactly the

15   same," the ALJ is required to explain how "the other most persuasive

16   factors in paragraphs (c)(3) through (c)(5)" were considered. *Id.* §

17   404.1520c(b)(3).

18   [60] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

19   [61] AR 551.

incarcerated.[62] After release from prison, he found that he could only walk 3 blocks due to throbbing in his left leg, only relieved by elevating the leg.[63] He recently had a carpal tunnel release surgery and was on pain medication.[64] On examination, Dr. Garcia noted right posterior calf with varicose vein clusters, and spider veins of the foot, and the left leg had a large varicose vein cluster in the posterior calf, distal posterior thigh, and medial leg, and spider veins in the left foot and ankle.[65] Dr. Garcia assessed varicose veins interfering with activities of daily living and recommended compression stockings and an ultrasound.[66]

On July 30, 2019, Plaintiff presented to Leslie Pohl, PA-C, for follow-up for venous insufficiency after three months of conservative

---

[62] *Id*.

[63] AR 551-552.

[64] AR 552.

[65] AR 554.

[66] AR 555.

compression treatment failed.[67] Plaintiff was experiencing throbbing pain causing difficulty walking and on examination had insufficiency of the left greater saphenous vein, with multiple varicose veins in both legs.[68] PA-C Pohl consulted with Dr. Garcia and recommended left stab phlebectomies with 10-20 stabs.[69]

On October 9, 2019, Plaintiff presented to Dr. Garcia for follow-up, at which Dr. Garcia noted numbness of the feet on examination and imaging showing reflux of the left calf greater saphenous vein.[70] Dr. Garcia performed a 32 stab phlebectomy of the left posterior calf veins.[71] On October 29, 2019, Plaintiff returned to Dr. Garcia reporting significant improvement in his left leg since the surgery with healed incisions, but reporting increased pain, itching, and swelling in the

---

[67] AR 636.

[68] AR 638-639.

[69] AR 639.

[70] AR 959-961.

[71] AR 962.

right extremity.[72] A doppler study performed on November 1, 2019, indicated deep reflux in the greater saphenous vein of the right leg.[73] On November 5, 2019, Plaintiff followed up with Lindsay Waterman, ARNP, and reported continued pain, swelling, and itching in the right lower extremity.[74] He also reported some residual pain in the left leg.[75] ARNP Waterman noted that there were varicose veins in both extremities but that there were no spider veins.[76] She assessed chronic venous insufficiency manifested by varicose veins and counseled Plaintiff that it was not a life threatening condition.[77]

On January 8, 2020, Plaintiff presented to Dr. Garcia for follow-up for venous insufficiency following conservative therapy for right extremity and endorsed pain, itching, and swelling in his right leg after

---

[72] AR 948.

[73] AR 951.

[74] AR 936.

[75] *Id.*

[76] AR 938.

[77] *Id.*

prolonged standing that required him to sit and raise his leg.[78] He reported some relief with compression stockings and residual pain his left leg after vein surgery.[79] On examination, Plaintiff had varicose veins bilaterally.[80]

Dr. Garcia noted:

IMPRESSION: Right GSV [greater saphenous vein] patent-measures 4.1-6.7 mm in diameter. Competent in the thigh and SFJ but reflux distally, up to 3.5 sec at knee. Varicose veins originating from proximal calf from GSV, largest measures 4.2 mm with 4.6 sec reflux. Deep reflux 1 sec CFV, 2.2 sec femoral vein, and 1.7 sec popliteal vein. There is no evidence of deep venous thrombosis or outflow obstruction of the right lower extremity.[81]

Dr. Garcia planned a right GSV radiofrequency obliteration endovenous catheter-based ablation, as well as stab phlebectomies of the varicose veins on his right leg and residual veins on the left.[82]

---

[78] AR 925.

[79] *Id.*

[80] AR 928.

[81] AR 929.

[82] *Id.*

Dr. Garcia performed the procedures the same day.[83] On January 13, 2020, Plaintiff returned for a post-op doppler which revealed that the GSV was occluded up to the level of the epigastric branch.[84] Plaintiff also complained of increased pain and redness, worried about an infection and asked to be seen.[85] On examination, there was swelling, blanching erythema, and tenderness on palpation, and PA-C Chrys Buchanan assessed cellulitis.[86] On January 19, 2020, Plaintiff presented to the ER of Tacoma General with continued leg pain, and concern that he had a blood clot.[87] Plaintiff complained of sharp pain in his right leg radiating up to the groin area.[88] Blood tests indicated leukocytosis and a doppler study indicated thrombus in the greater

---

[83] AR 930-931.

[84] AR 923.

[85] AR 914.

[86] *Id.*

[87] AR 868.

[88] *Id.*

saphenous vein.[89] At a follow-up on February 4, 2020, Plaintiff reported continued right scrotal discomfort.[90]

On October 20, 2020, Plaintiff presented to PA-C Pohl with complaints that he had initially improved after surgery to his left leg but that his condition began worsening several months later and he now had aching and occasionally shooting pain.[91] Plaintiff reported continued use of compression stockings with some improvement but continued difficulty with prolonged standing.[92] On examination, Plaintiff had multiple healed scars from prior phlebectomies and had a small firm area in the medial calf tender to palpation.[93] On October 30, 2020, a doppler study indicated that the left great saphenous vein was

---

[89] *Id.*

[90] AR 860.

[91] AR 845.

[92] *Id.*

[93] AR 847.

not obstructed but there was reflux in the left mid saphenous vein and left proximal saphenous vein.[94]

On November 3, 2020, Plaintiff presented to Dr. Garcia for follow-up following a recent ultrasound noting "GSV reflux 0.9 seconds at saphenofemoral junction and left calf reflux of 3.2s."[95] Plaintiff reported pain with prolonged standing.[96] Dr. Garcia requested insurance approval for GSV radiofrequency obliteration and left leg stab phlebectomy.[97] On November 18, 2020, Plaintiff was seen by Joni Casteneda, DO, for counseling regarding smoking cessation and reported that he continued to have left lower extremity pain while awaiting treatment and asked for a sleeping medication to help him sleep.[98] On December 11, 2020, Dr. Garcia performed a left radiofrequency obliteration of greater saphenous vein, left leg stab

---

[94] AR 850.

[95] AR 827.

[96] *Id.*

[97] AR 831.

[98] AR 817.

1    phlebectomy N-16.[99] The pre-procedure and post-procedure diagnosis

2    was left leg symptomatic veins, and Dr. Garcia noted that the left

3    greater saphenous vein was patent prior to procedure and occluded

4    post-procedure.[100] Dr. Garcia also performed a left stab phlebectomy

5    with 16 stabs.[101] Plaintiff was discharged without complications.[102]

6        On December 23, 2020, a post-surgical doppler study was

7    performed by Sarah Koch, MD, of the Pulse and Heart Institute.[103] The

8    impression was: "Left greater saphenous vein surgically occluded, with

9    acute thrombus extending slightly into the common femoral vein

10    without occlusion or flow limitations."[104] Plaintiff presented to

11    Dr. Garcia on January 12, 2021, and Dr. Garcia opined that other than

12

13    _____

14    [99] AR 797-798.

15    [100] AR 797.

16    [101] AR 798.

17    [102] AR 795-796.

18    [103] AR 787.

19    [104] AR 787.

numbness in his left leg Plaintiff was recovering well from his surgery.[105]

On April 13, 2023, Plaintiff presented to Bob Lee, MD, of the Multicare Rockwood Physiatry Center with complaints of numbness in his left hand and bilateral numbness and tingling in both legs and feet.[106] Plaintiff denied a history of diabetes or alcohol abuse but reported a prior bilateral carpal tunnel release, as well as multiple varicose vein removal procedures bilaterally, a history of thrombophlebitis in his right leg, hypertension and hyperlipidemia.[107] Plaintiff reported that his exercise consisted of walking several miles daily and working on cars, and Plaintiff sat comfortably in a chair.[108]

On examination, Plaintiff had full strength bilaterally in his upper extremities, grossly intact cranial nerves, a Hoffman test that

---

[105] AR 779-780.

[106] AR 751.

[107] AR 751-752.

[108] AR 754.

was negative bilaterally, and a heel to toe strike gait.[109] Dr. Lee noted

that Plaintiff's physical history and examination suggested a nerve

entrapment in the upper left extremity and possible peripheral

neuropathy in his lower extremities.[110] Dr. Lee also noted that

electrodiagnostic testing performed on the upper left extremity that

day indicated mild left median mononeuropathy and testing performed

on the lower extremities indicated "chronic severe axonal sensory and

motor peripheral neuropathy."[111] Dr. Lee diagnosed carpal tunnel

syndrome of the left wrist, paresthesia, and neuropathy, and

recommended use of a hand brace as well as ordering fasting lab tests

to determine the etiology of Plaintiff's neuropathy.[112]

   3.    Analysis

   Plaintiff argues the ALJ erred when he failed to address the

medical findings by PA-C Pohl, ARNP Waterman, PA-C Buchanan, and

_____

[109] AR 755.

[110] Id.

[111] Id.

[112] AR 751, 755.

Dr. Garcia that Plaintiff needed to elevate his legs due to chronic venous insufficiency. The Court agrees.  The Commissioner admits in his brief that the ALJ failed to address the medical statements from various providers that Plaintiff should elevate his legs but argued that the ALJ was not obligated to consider them because they did not constitute "medical opinions" within the definition of the regulations because they were merely "recommendations."

The Court concludes that the statements about the need to elevate his legs by Plaintiff's medical providers constituted an opinion and that additionally, absent a finding that they constituted opinion evidence, the statements were medical evidence that the ALJ should have considered when assessing the consistency of the opinion of Dr. Hale with the longitudinal record.

The regulations provide: "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) *and whether you have one or more impairment-related limitations or restrictions in the following abilities.*"[113]

---

[113] 20 C.F.R. § 416.913(2) (emphasis added).

DISPOSITIVE ORDER - 28

The context of the medical statements makes clear that the statements were not casual "suggestions" as the Commissioner appears to argue.  It was the statement of ARNP Waterman, for instance, that "[T]he primary mode of treatment is non-surgical with leg elevation and external compression."[114] This clearly indicates that the need for Plaintiff to elevate his legs was a restriction placed upon him by his treating sources, and was prescribed treatment in the same manner as medication or use of a cane or walker would be expected to be. Moreover, it was the statement of multiple treating sources that Plaintiff was required to elevate his legs to reduce swelling.[115]

While the Ninth Circuit Court of Appeals has not specifically ruled that the need to elevate legs meets the definition of a limitation or restriction as set forth in the regulations, there are several districts

---

[114] AR 938.

[115] AR 914, 917, 925, 929, 949.

in which this has been held to be a restriction or limitation pursuant to 20 C.F.R. § 416.913(2).[116]

Dr. Garcia made clear that he considered that the need for Plaintiff to elevate his legs would be a work restriction, stating: "Leg pain limits his ability to find work as cannot accommodate need for leg

_____

[116] See *Allen T. v. Comm'r of Soc. Sec.*, No. 20-1257, 2021 WL 1884956, at *4 (W.D. Wash. May 11, 2021) (finding that a form opinion describing the claimant's symptoms and limitations constituted medical opinion because the doctor opined the claimant could perform sedentary work and recommended claimant elevate his legs at work, thereby implicating his ability to sit, which is a functional workplace limitation). *See also Carrie D. v. Kijakazi*, No. 20-3227, 2022 WL 2901010, at *6 (E.D. Wash. June 6, 2022) (finding doctor's notes that Plaintiff needs to raise her legs while seated which may have corresponding workplace limitations falls within the definition of medical opinion as it relates to meeting the physical demands of work).

elevation, interferes with his ability to work, care for himself, clean his living arrangement.[117]

The ALJ made a vague finding regarding Plaintiff's need to elevate his legs, stating briefly that in October 2020, "[Dr. Garcia] recommended ibuprofen, ice, compression and elevation for a likely superficial phlebitis of his right calf."[118] The statement misquotes the record, however. Dr. Garcia was not recommending elevation of the leg for superficial phlebitis, he was recommending it because Plaintiff had varicose veins in both legs and had developed a new varicose vein in his left leg despite the fact that he had already undergone two separate rounds of stab phlebectomies.[119] Aside from the prescribed treatment to elevate his legs, Dr. Gracia ordered an ultrasound to be performed and a follow-up in 2 weeks to discuss the results of the ultrasound.[120]

_____

[117] AR 957.

[118] AR 27, citing AR 848.

[119] AR 848.

[120] *Id.*

The ALJ did not consider the statements to be medical opinions and also declined to consider the opinion of state agency consultant JD Fitterer, MD, who rendered his opinion prior to Plaintiff's treatment for varicose veins and at a time when the medical record was relatively sparse.[121]  As a result, the only medical opinion considered by the ALJ as to Plaintiff's physical limitations was that of non-examining state agency consultant Gordon Hale, MD.[122]

The ALJ articulated his consideration of Dr. Hale's opinions as follows:

> In October 2019, state agency consultant, Gordon Hale, M.D., opined that the claimant could perform work at a light exertional level with lifting and carrying 20 pounds occasionally and 10 pounds frequently and sitting, standing, and walking for six hours in an eight-hour workday (4A). Dr. Hale opined that the claimant could occasionally climb and crawl and frequently balance, kneel, and crouch (4A). Further, Dr. Hale opined that the claimant should avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards (4A). The undersigned finds Dr. Hale's opinions somewhat persuasive because they are somewhat consistent with and supported by the medical evidence. The treatment records show that the claimant could perform medium exertional work.

---

[121] AR 29.

[122] AR 29-31.

Examinations revealed varicose veins and corresponding areas of tenderness on his legs (4F/7; 7F/5; 10F/81, 97, 122, 164, 188, 199). However, the treatment records show that the claimant experienced symptoms improvement with ablations, phlebectomies, and compression socks.[123]

Initially, the Court notes that, while the ALJ stated that he found Dr. Hale's opinion to be somewhat persuasive, he discounted Dr. Hale's finding that Plaintiff was limited to work at the light level of exertion and instead found him capable of performing medium exertion work. In doing so, the ALJ gave little, if any, consideration of the supportability factor when assessing Dr. Hale's opinion. It is notable that Dr. Hale's explanation of his findings makes no mention of Plaintiff's venous insufficiency and addresses only the symptoms of carpal tunnel syndrome.[124] The ALJ did not address the fact that Dr. Hale's opinion was not supported by an explanation.

The ALJ failed to consider the consistency of Dr. Hale's opinion with those of the treating providers that Plaintiff would be expected to need to elevate his legs. It is unclear whether the limitation was

---

[123] AR 30.

[124] AR 120-123.

expected to change following Plaintiff's ablation surgery, but regardless of any improvement, there was a period, at a minimum from October 2019 through January 2021, in which those restrictions were prescribed by medical sources.

The ALJ is required to explain how a medical opinion or administrative medical finding is or is not *both* 1) supported by "more relevant . . . objective medical evidence and supporting explanation presented by [the] medical source," i.e., the supportability factor; *and* 2) "consistent with the evidence from other medical sources and nonmedical sources in the claim," i.e., the consistency factor.[125] Here, the ALJ erred when considering the consistency factor and did not consider the supportability factor.

On remand, the ALJ is to develop the record as to Plaintiff's physical impairments and schedule a consultative examination and, if necessary, call a medical expert to testify. The ALJ is to reassess Plaintiff's ability to use his upper extremities considering his diagnosis of carpal tunnel syndrome, and reassess Plaintiff's ability to use his

_____

[125] 20 C.F.R. § 416.920c(c)(1)–(2).

lower extremities considering his chronic venous insufficiency and peripheral neuropathy

Because the Court has remanded the case for further proceedings, the ALJ is to re-evaluate the medical opinion evidence as a whole and articulate his findings as to both the supportability and consistency of the opinions.

**B.    Symptom Reports and Other Steps of the Evaluation Process: this issue is moot.**

Plaintiff argues that the ALJ failed to provide valid reasons for discounting his subjective complaints and erred at steps two, four, and five. Because the Court is remanding the case with direction that the ALJ re-evaluate the medical opinions and administrative medical findings, the ALJ must re-evaluate Plaintiff's symptom reports and conduct the disability evaluation anew.

**C.    Remand: further proceedings**

Plaintiff prefers a remand for payment of benefits, rather than a remand for more proceedings. However, when the court reverses an ALJ's decision for error, the court "ordinarily must remand to the

agency for further proceedings."[126] At this time, remand for further proceedings is appropriate.

On remand, the ALJ is to fairly and fully consider the longitudinal record, reevaluate the medical opinions and Plaintiff's symptom reports, and then complete the five-step disability evaluation, assessing whether Plaintiff was disabled for at least a 12-month period during the at-issue period.

## IV.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to reevaluate—with meaningful articulation and evidentiary support—the sequential process. If necessary, the ALJ is to call a medical expert to testify as to the combined effects of Plaintiff's physical impairments and their effect on his ability to perform work at the medium, light, or sedentary exertional level.

Accordingly, **IT IS HEREBY ORDERED**:

---

[126] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987).

1.    The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 13**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 14th day of October, 2025.

*Edward F. Shea*
_____
EDWARD F. SHEA
Senior United States District Judge